STOKER, Judge.
This appeal by Joe E. Fryar concerns construction of contract terms which refer to the obligation on the part of Joe E. Fryar to establish a “line of credit” in favor of another party to the contract.
As appellant here Joe E. Fryar asserts:
The two essential questions presented by this appeal are:
(1) In the event a line of credit is due, in whose favor does it run?
(2) If a line of credit is due, what is the nature of the line of credit contemplated by the contractual terms of the parties?
Without an extensive recitation of facts the issues on appeal here cannot be understood. However, it may be said at this point that the case does involve what the contracting parties meant in their contract documents by the term “line of credit” and how it should be applied at this juncture in the history of events concerning the contracting parties and others.
In addition to the principal issues, we deal with two motions filed on behalf of Joe E. Fryar, the appellant. These are a motion to stay the proceedings in this appeal and a motion to dismiss the “cross-appeal” of John W. Peck and Peck, Shaffer & Williams.
The “cross-appeal” of John W. Peck and Peck, Shaffer and Williams challenges the trial court’s February 11, 1985 judgment which provided in pertinent part that 80% occupancy for a three-month period was evidence that Westside Habilitation Center was self-sustaining. Originally Fryar also challenged this ruling for other reasons, but has abandoned this issue on appeal because Fryar claims Westside has reached the required occupancy since the judgment was rendered.
We are informed by Fryar in his motion for a stay of proceedings that he was directed by a bankruptcy court to turn over the operation of the facility to Westside. If this is so, it might be that the occupancy question should be pretermitted here and possibly the case should be remanded to the trial court for inquiry into any developments which have occurred since this appeal was lodged. In view of the resolution we ultimately reach, do not deem this necessary.
FACTS
Joe E. Fryar and Westside Habilitation Center, Inc. came together for development of a project. Fryar was to develop the project into a going concern; then Westside Habilitation Center, Inc. (Westside) would become the operator. Although development of the facility, including construction and renovation of certain existing buildings, took place, a financial debacle befell the enterprise because of the failure of an Oklahoma bank. Funds raised by the sale of bonds to finance the facility were lost for a period of time as a result of the bank failure, causing delays in the Westside development. Other issues arising out of the unfortunate loss of the bond monies have been before us in other litigation.
Under the scheme for bringing the West-side facility into being, Fryar obligated himself to develop, build, recruit patrons *430 for the facility, and put it on an operating business basis. At this point Westside was to take over. The legal relations of appellant Fryar and appellee Westside were regulated by a contract and a trust indenture agreement. These contracts involved other parties including a trustee, Bossier Bank & Trust Company (Bossier Bank). Bossier Bank ultimately resigned as trustee but nevertheless continued to hold funds placed with it as trustee.
At issue is whether Fryar has “Completed” his contract. Completion under the contract has a broad scope and includes the matter of establishing a line of credit. Also at issue in determining if Completion has occurred is whether Fryar has brought the facility as an operating concern to a specified occupancy level. Completion is significant among the various parties to this litigation because it is a determinative factor in the disposition of certain trust funds. Fryar, by motion, sought a court-directed distribution of trust funds on June 29, 1983. Bossier Bank, holder of funds as the former trustee, filed a similar motion on October 4, 1983. Following the motion of Bossier Bank, Fryar filed amended pleadings in which he sought to be relieved of certain Completion obligations. Fryar sought authority to deviate from the Development Agreement and Trust Indenture to (1) relieve him of the obligation to establish or furnish a line of credit for the benefit of the property, and (2) to relieve him of the Completion obligation which required Fryar to produce an occupancy rate at the facility for a determined period of time.
In effect these particular Completion conditions were designed to obligate Fryar as developer to develop and turn over to Westside a going business concern with a line of credit upon which it could rely in case of need if cash flow problems arose. It is important to Fryar to have a judicial determination that Completion under the contract terms has been achieved in order that he may be relieved of further obligation to operate the facility, and also to collect any funds which may be due him. The trial court determination was adverse to Fryar. Fryar appeals that determination. John W. Peck and Peck, Shaffer and Williams, asserting an interest in the questions on appeal, filed an appeal styled as a cross-appeal. Fryar filed a motion in this court to dismiss the so-called cross-appeal.
The foregoing provides a general outline of the facts of the case before us. However, we deem that an even more detailed recitation is a prerequisite to an understanding of the issues on appeal. The following detailed recitation will necessarily repeat some facts already touched on.
Westside Habilitation Center, Inc., located at Cheneyville, Louisiana, is an intermediate care facility for the mentally retarded and emotionally disturbed. The center is comprised of a renovated school building now used as a school, training, recreational and infirmary facility, and six separate housing units or dormitories. Westside raised funds with which to develop the facility through the issuance and sale of Westside revenue bonds.
Development of the project included acquisition of the site of an old school building, renovation of the school building, and construction of housing units. The renovation and construction involved in the project was the subject of the Development Agreement and Indenture Agreement.
Westside is a nonprofit corporation formed solely for the purpose of operating the facility. Its function was to operate the facility, to provide the residents the care that they need, and to make certain that contracts it entered into with others are complied with. Thus Westside, as con-tractee, had the duty of seeing that Joe E. Fryar met and performed all of his obligations under the Development Agreement, including meeting and performing all the requirements necessary to achieve Completion.
Fryar initially became the owner of the property and personally obtained the certificate of need, was the developer and had put in years of work to bring its development to fruition. In return for his efforts he anticipated realizing a profit. As the prime mover in the project Fryar undertook *431 certain risks. As an entrepreneur he took these risks in the hope of realizing financial reward.
One of the risks which Fryar assumed was the possibility that Westside might develop a need for funds to meet its obligations with no means to meet that need. The solution for avoidance of the risk was to require Fryar to arrange for a line of credit as a source for such funds. This obligation assumed by Fryar was made an integral part of the contract arrangement and was made one of the criteria of “Completion,” as that term was defined in the contract documents. In the context of this case the term “Completion” has a meaning beyond its ordinary signification; it has specific legal meaning as defined in the contract documents.
A listing of all seven criteria of Completion appears in Section 1.1 of the Development Agreement, and on page 26 of the Trust Indenture. These criteria may be summarized as follows:
The developer shall deliver to the trustee the following:
1. A Certificate of Completion by the inspecting architect;
2. An MAI appraisal establishing a certain value;
3. A mortgagee’s title insurance policy;
4. A written opinion by an attorney for Westside concerning encumbrances in the public record;
5. Evidence that the operating line of credit has been established;
6. Approval by the Louisiana Department of Health and Human Resources of reimbursement under the Medicaid Program based upon the actual, historical per diem cost of operating the project; and
7. A mortgage and chattel mortgage in favor of the trustee.
A requirement of approval under the Medicaid Program (No. 6 above) involved 80% occupancy of the project for not less than 90 days. That requirement is described in the Official Statement, or prospectus, in Section 1.1 (vi) at page 2 thereof, as follows:
“Under current DHHR regulations, an intermediate care facility for the mentally retarded must be licensed by DHHR’s Office of Licensing and Regulation, Division of Licensing and Certification, and must have operated at not less than 80% occupancy for not less than 90 days to be eligible to receive reimbursement based on historical costs.”
After the filing of numerous pleadings in late 1983 and early 1984, a trial of the issue of whether or not Fryar had achieved completion was held in early March of 1984. In September of 1984 the trial court ruled that Fryar had not achieved Completion, explaining the basis for that ruling in its Reasons for Judgment. Fryar then filed a “Motion for New Trial,” and provoked another evidentiary hearing on the issue of Completion. That hearing was held on October 22, 1984. Supplemental reasons for judgment were filed on November 26,1984. A judgment and amended judgment were eventually signed by the court in February of 1985. Fryar has appealed one aspect of that judgment.
In the court’s judgment of February 19, 1985, after first ruling that Fryar had performed his obligations as to the first four criteria of completion above, the court ruled as follows:
“The Developer, Joe E. Fryar, has not obtained Completion as required by the Development Agreement and Trust Indenture in that:
a) Joe E. Fryar is required to establish an Operating Line of Credit in favor of Westside Habilitation Center, which Operating Line of Credit must be from a bank or similar financial institution, co-terminous with the life of Westside Habilitation Center Bonds, and be the unconditional obligation of such bank or financial institution.
b) The Westside Habilitation Center must be in a self-sustaining position before the Developer, Joe E. Fryar, can be found to have achieved Completion and therefore released from his obligation to operate to the terms and *432 conditions of the Development Agreement; and, that evidence that Westside Habilitation Center is in a self-sustaining position will be the operation of the Westside Habilitation Center for a period of three months with an occupancy of 80% or more, or, in the alternative, an acceptable audit.”
With respect to the 80% level of occupancy requirement for Completion, Fryar abandons his appeal of that portion of the judgments.
As noted initially, Fryar asserts that this appeal presents only two questions, both of which relate to the line of credit issue.
OPERATING LINE OF CREDIT
Fryar argues that the “operating line of credit” runs only in favor of the trustee and not directly to Westside. He argues further that Westside had an obligation to replace the trustee when Bossier Bank resigned. Fryar apparently concludes he no longer owes the obligation because there is no trustee to which the “line of credit” can be tendered.
It is obvious that the contract contemplates that the “operating line of credit” is for the benefit of Westside. There is a provisional trustee, a trustee in bankruptcy, and a district court judge to oversee and safeguard the affairs of Westside. The fact that Westside has been unable to find a willing entity to serve in the position of trustee does not abrogate Fryar’s duty to provide the “operating line of credit.” The trial court is correct in so holding.
Fryar also contends that the line of credit need not be from a bank or financial institution. Fryar has tendered a letter evidencing what he purports to be a $1,000,000 “operating line of credit.” In his supplemental reasons for judgment the trial judge held as follows:
“Much has been said in briefs of counsel about the operating line of credit which Mr. Fryar tendered. This Court, after reviewing the citations submitted by counsel and as the result of its own independent research, is of the opinion that a line of credit is simply a commitment by a proposed creditor giving a proposed debtor the right to borrow or incur debt up to a certain amount. The Court has been unable to find any authority for the argument that the line of credit must be extended by a bank or institution. A manufacturer or a wholesaler can extend a line of credit to a retailer whereby the retailer may buy merchandise up to a certain credit limit. However, the evidence in this case leaves no doubt that it was intended that Mr. Fryar would establish a line of credit for Westside with a bank or similar institution. The spirit and intent of the documents are to that effect. The line of credit must be during the term of the bonds. There is no assurance that the line of credit tendered by Mr. Fryar would have vitality during that length of time. The line of credit must also be unconditional. Mr. Fryar’s testimony is indicative of an attitude that any draw against the line of credit would be subject to his approval. This is not the type of line of credit intended by the documents.”
We find that the record fully supports the trial court’s judgment concerning the “line of credit.” John Peck testified at trial as an expert in the field of bonds and finance. He explained that “line of credit” is a term of art with particular meaning in the financial world. He further explained that he had never seen, in the course of his business, an “operating line of credit” issued by an individual, and not secured by the full credit and financial strength of a banking institution, and that it was standard in the field that such an “operating line of credit” be issued by a bank or other financial institution. He also testified, as bonding counsel to the Westside Project and as a person intimately involved in the negotiations and drafting of the various contracts, that it was his opinion that it was the intent of all of the parties involved that the “operating line of credit” would be one secured by the full financial strength of a bank or other financial institution.
*433 The “operating line of credit” contractually mandated is for an amount of $1,000,-000 and must survive for the life of the bonds, which is thirty years. The furnisher of the line of credit should obviously be capable of furnishing ready funds in the amount of $1,000,000 and must do so for a period of thirty years. It becomes obvious that the furnisher of such a “line of credit” should be a legal entity which can provide continuity and not a biological person, no matter the demonstrated financial ability of the biological person. It would hardly appear plausible that the furnisher of the line of credit, however presently wealthy and financially stable, can be assumed to be a biological person. Inasmuch as the term of the obligation is some thirty years, it could hardly have been contemplated that the continuing obligation should have been made to rest upon anything so uncertain as one human life.
Finally, Fryar contends that the “line of credit” is conditional. He argues that he controls the funds he claims he is making available. He supports this contention by reference to certain constraints or conditions he finds in the indenture document concerning the trustee. If there are conditions, they are conditions imposed upon the trustee (or Westside) and do not concern Fryar. His obligation is to furnish a “line of credit” and is not affected by these so-called conditions.
CROSS-APPEAL
Fryar has filed a motion to dismiss the “cross-appeal” of John W. Peck and Peck, Shaffer and Williams (hereinafter Peck). Fryar asserts that Peck has no interest in the judgment and further that there is no Louisiana procedure available which is denominated “cross-appeal.”
LSA-C.C.P. art. 2086 provides:
“A person who could have intervened in the trial court may appeal, whether or not any other appeal has been taken.”
The trial court allowed Peck’s intervention and we agree that Peck has shown the requisite interest to allow intervention.
It is not necessary that a person have a judgment directly against him in order to have the capability of appealing. Any party “aggrieved” by the judgment or who may be aggrieved has a right to appeal. Brock v. Tidewater Const. Co., 318 So.2d 100 (La.App. 3d Cir.1975). The sole object of appeal is to give an aggrieved party recourse to a superior tribunal for correction of a judgment of an inferior court. Such a right is extended not only to parties to a suit in which a judgment is rendered, but also to third parties who are allegedly aggrieved by a judgment. Bradley v. Central Louisiana Elec. Co., Inc., 437 So.2d 999 (La.App. 3d Cir.1983).
It is likewise of no moment that Peck’s denomination of its notice of appeal was a “cross-appeal.” The court in Primvest, Inc. v. Dugas, 460 So.2d 718 (La.App. 3d Cir.1984), explained at page 721:
“Our courts look through the caption, style, and form of pleadings to determine from the substance of the pleadings the nature of the proceedings.”
While we recognize the appropriateness of Peck’s appeal, we do not choose to address the issue presented. Peck assigns as error the court’s determination that 80% occupancy for a period of three months provides proof that Westside has achieved the necessary self-sufficiency envisioned by the project documents. Since we decide that Fryar has not completed the project because he failed to provide the requisite “operating line of credit,” we do not feel we need to address this issue. We do not believe it would be appropriate to analyze the problem in light of the changed circumstances brought about by the bankruptcy proceedings. We feel that the bankruptcy action renders this issue moot at present, so we refrain from any decision or further discussion of this aspect of the case at this time.
MOTION TO STAY PROCEEDINGS ON APPEAL
Fryar attached to his motion for a stay of proceedings copies of certain bankruptcy *434 proceedings which purport to show the following facts.
About one month after the final judgment was signed in the district court, West-side Habilitation Center, Inc. filed a voluntary petition under Chapter 11 in the United States Bankruptcy Court for the Western District of Louisiana. Fryar asserts that issues involving the interpretation and enforcement of the Development Agreement have been raised in the bankruptcy proceeding. Therefore he asks us to stay this appeal pending the outcome of the bankruptcy proceedings. We refuse to stay this appeal because we see no conflict.
The matters before this court are merely questions of construction of terms of a contract. It does not appear that these issues are being litigated in the bankruptcy proceeding. The Bankruptcy Court has issued a turnover order to compel Fryar to surrender the management of Westside to Westside as a debtor-in-possession. This does not resolve the dispute between the parties concerning the construction of the contractual terms.
We do not believe that Fryar should be relieved of his duty to supply the $1,000,-000 “operating line of credit” because of the bankruptcy proceeding.
We affirm the trial court’s decision that Fryar has failed to reach Completion because he has failed to provide an unconditional $1,000,000 line of credit from a bank or similar financial institution, co-ter-minous with the life of Westside Habilitation Center Bonds.
The costs of this appear are assessed to the appellant, Joe E. Fryar.
AFFIRMED.